Filed 10/1/25  Stewart v. Morris CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| ALDEN CLARENCE STEWART, | |
| Plaintiff and Appellant, | E080865 |
| v. | (Super.Ct.No. DVIN1902691) |
| ALDEN CHAZMIN MORRIS, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Kristi Hester, Judge. Affirmed.

Alden C. Stewart, in pro. per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Alden C. Stewart appeals from the trial court's denial of his request to renew a domestic violence restraining order protecting him from his adult son, Alden C. Morris. We affirm.

BACKGROUND[1]

In 2019, Stewart filed a request for a domestic violence restraining order to protect himself, his wife Susan Stewart, and his adult son Roman Stewart from Morris.[2]  At a hearing in October 2019, Stewart played an audio recording of a telephone call in which Morris threatened to kill Stewart and Susan.

On October 15, 2019, the trial court issued a three-year restraining order protecting Stewart from Morris but denied the request to include Susan and Roman as protected persons.  Morris was also ordered not to contact Stewart directly or indirectly by any means, not to engage in certain behaviors toward Stewart, and to stay at least 100 yards from Stewart, his workplace, and his vehicle.  The order contained the following exception:  "Mr. Morris may have brief and peaceful contact with Mr. Stewart for purposes of visitation with Susan Stewart and/or Roman Stewart.  He may go to the home of Alden Stewart to pick up Roman."

On October 14, 2022 (one day before the restraining order's expiration date), Stewart filed a request to renew the restraining order for five years.  He submitted the following documents in support of the request:  A declaration from himself, an affidavit from Susan, two separate and identical pages of screenshots of text messages between Morris and a sibling, a Banning Police Department incident report from May 15, 2021, an

---

[1]    We do not consider factual contentions made by Stewart in his opening brief that "'are based on information that is outside the record.'"  (*County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861.)

[2]    Because some of the people described in the opinion have the same last name as Stewart, we refer to them by their first names.  No disrespect is intended.

order of arrest by a private person (Stewart) of Morris on the same date, and a printout from the Long Beach Police Department indicating that a 911 call was made in September 2020, without any details of who made the call or the subject matter of the call.

In his supporting declaration, Stewart stated that he feared Morris, even though Morris moved to Texas in June 2021. Stewart described conduct that occurred before and after the restraining order's issuance, including the same recorded phone call of Morris threatening to kill Stewart and Susan.

Steward claimed that in January 2020, Morris called Stewart's landlord and falsely claimed that Stewart was a drug dealer, causing Stewart to be evicted. That same month, Morris told Susan that Roman had died. Susan screamed in panic, and Morris then revealed that he was joking. Stewart described an incident in which Morris body slammed and violently restrained Roman in Long Beach, California, but Stewart did not say when the incident happened. Stewart also claimed that in September 2022, Morris was arrested in Texas after trying to break the arm of his disabled sister, Savahna, "to stop her from recording him in his Texas home." Morris allegedly was drinking at a bar with Savahna before the incident. Stewart further alleged that in July 2021, Morris asked a "household member" "to conduct surveillance" of Stewart. Morris texted, "Just cuss him out and record him lol," followed by "keep sending me the recordings."

Stewart also described an incident that occurred on May 15, 2021, when Morris was picking up Roman from Stewart's residence. Roman wanted to show Morris a

3

motorcycle in the garage, and as the two started to enter the garage, Stewart told them to stop. Morris then charged at Stewart, motioned to take off his shirt, and yelled, "Ill [*sic*] beat your ass bro! come on lets do this." Stewart called 911, and Morris left.

Susan's affidavit describes the May 15, 2021, incident, saying that she saw "Morris become aggressive yelling on our property and challenge his father to a fight during a pick up and drop off visitation with me and his brother Roman." The affidavit is followed by a page entitled "Notary Public," but it is signed by Susan and no one else.

The court heard Stewart's renewal application in January 2023. Both Stewart and Morris appeared in person and testified at the hearing. Stewart testified first. At the outset, the court indicated that it had read Stewart's renewal request and that renewal might be supported by a couple of the incidents he described. The court explained that in determining whether to renew the restraining order protecting Stewart, the court could not consider conduct directed toward others. The court also told Stewart that it could not add any of Stewart's family members to the restraining order as protected parties. Stewart said that he was not asking to add his family members to the order but wanted the order modified to limit Morris's contact with them. In particular, Stewart expressed frustration about Susan communicating with Morris on speakerphone. The court denied the request because the other family members were not protected parties on the original restraining order.

The court directed Stewart to testify about anything that he believed warranted renewal of the restraining order. Stewart testified about the May 15, 2021, incident,

4

which he described as "the main thing" supporting renewal. Stewart testified that when he saw Roman and Morris headed to the garage that day, he told them that he did not want anyone in the garage. Morris responded, "'Hey, what the fuck you say,'" moved toward Stewart, stopped 15 feet away, and "began to motion to take off his jacket was, 'Oh, fuck you. You're recording me? I'm going to record you' and he created a disturbance." Stewart then called 911, and Morris left. The court asked Stewart to describe the "disturbance," and Stewart added that before Morris motioned to remove his jacket, he said, "'We can do this.'"

Stewart started to testify about the police report concerning that incident, but the court stopped him and told him that the statements constituted inadmissible hearsay. The court excluded other police reports on the same basis and informed Stewart that the law enforcement officers would have to testify to describe their accounts of what happened. Stewart stated: "Well, you know, I mean short of asking, you know, to, you know, continue this matter to have these officers to testify, I—if it—I don't think that's needed for you to renew the order here today. But, you know, that's where I would leave it at. You know, I believe that I've proven in enough sufficient evidence, you know."

Stewart argued that in addition to the May 15, 2021, incident, the eviction in 2020 and Morris's text messages to Savahna in July 2021 asking her to record Stewart also supported renewal. Stewart stated that the text messages demonstrated that Morris was attempting "continued acts of surveillance" by asking Savahna to record him. With respect to the eviction, Stewart said that when the landlord terminated the lease, the

5

landlord told Stewart, "'Look, I've had enough. I've been contacted,' you know, 'by your son, and I've also been contacted by Mrs. Stewart. At this point with not paying the rent issue—." Stewart later explained that Susan had contacted the landlord for the purpose of adding their daughter to the lease. The court noted that from Stewart's description of the landlord's statements it did not appear as though the landlord evicted the family based on Morris's conduct alone.

Morris confirmed that he lived in California when the restraining order was issued, but he later moved to Texas, where he currently lives. Morris "dispute[d] everything [Stewart] said," and he alleged that Stewart was "lying." Morris had evidence "on consented recording lines" to corroborate his claim, including a recording of Susan on a "consented line saying she never wrote the affidavit" and a recording of Stewart screaming at Morris and "threatening to ruin everything for [Morris]." Morris stated that Stewart wanted him to stay away from the family for the purposes of control and power and not because Stewart feared Morris.

The court asked to hear the recording, which Morris explained was "a few different recordings." Stewart objected on the ground that "[i]n one case he's attempting to introduce what I feel are at least marital privilege." The court overruled the objection, explaining that marital privilege did not apply to a communication between Susan and Morris. The court directed Morris to play the recording. The first recording was a call with Roman. Before the recording started to play, the court reporter asked, "Am I going to have to take this down, Your Honor," and the court replied, "No." The audio

6

recording was played. Another recording was played, and Morris said that it was "the Officer Nieto." Morris explained that in the next recording he asked Susan about the affidavit. Stewart objected that Morris had not provided him with the evidence before the hearing, but Morris said that he had. The court noted the objection, and the audio recording continued to play.

The court subsequently directed Morris to stop the recording and gave Stewart an opportunity to comment. The court asked Stewart if Susan wrote the affidavit, and Stewart answered, "She has consented to the facts in it, and I do have here—." The court interjected, "I'm going to deny the request for the renewal of the restraining order." The court explained that unless Susan was there to testify, the court had "enough concern regarding the veracity of the statements and the information that's been provided to the Court." Stewart stated that the "[t]he first document that you had was not notarized," but "I have it notarized by her. What you're—you're relying on his [*sic*] evidence without a notary. She has—this is recent." The court stated that in the recording Susan said that she consented to being recorded and that "she did not write that statement," i.e., the affidavit that Stewart had submitted to the court. Stewart explained that she signed a new affidavit two days before the hearing, and "she did not really understand at that time fully in terms of, you know, what it was that she may have been signing." Stewart added: "We have since discussed the nature of that day. She wasn't recalling certain facts." Stewart noted that the notary was present at the hearing. The court ruled: "Unless Susan Stewart is here to testify, I'm not accepting anything with her signature on it."

7

The court denied Stewart's request to renew the restraining order. The court explained that it had "sufficient concerns regarding the credibility of the information that's been presented to the Court. The fact that Mr. Morris no longer resides in California and now resides in Texas, he's not likely to have communications with you."

DISCUSSION

Stewart presents numerous arguments challenging the trial court's denial of his request to renew the domestic violence restraining order. We find no prejudicial error.

I.    *General principles of appellate review*

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) An appellant bears the burden of demonstrating, "on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) "In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287; Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).) We "disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he [or she] wants us to adopt." (*City of Santa Maria*, at p. 287.) All of those principles apply with equal force to self-represented litigants. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

8

Reversal is not warranted by "error alone." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822 (*Falcone*).) The appellant bears the burden of demonstrating that "'the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice.'" (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337; Cal. Const., art. VI, §13.) "A miscarriage of justice is not found 'unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result.'" (*Falcone*, at p. 823; *Hatley v. Southard* (2023) 94 Cal.App.5th 579, 592 (*Hatley*).)

II.     *The Domestic Violence Protection Act*

The Domestic Violence Protection Act (DVPA) (Fam. Code, § 6200 et seq.) defines domestic violence as "abuse" perpetrated against certain persons, including biological parents and siblings. (Fam. Code, § 6211, subd. (f); Prob. Code, § 13, subds. (b)-(c).) (Unlabeled statutory references are to the Family Code.) Under the DVPA, "[a]buse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) Rather, "'abuse'" under the DVPA includes placing "a person in reasonable apprehension of imminent serious bodily injury to that person or to another" (§ 6203, subd. (a)(3)) and "attacking, striking, stalking, threatening, . . . battering, . . . harassing, . . . contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party" (§§ 6203, subd. (a)(4), 6320, subd. (a)). Under the DVPA, "'disturbing the peace of the other party' refers to

9

conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).)

The DVPA authorizes renewal of a domestic violence restraining order "at the discretion of the court, without a showing of further abuse since the issuance of the original order." (§ 6345, subd. (a) (§ 6345(a)).) "'The renewal may be "for five or more years, or permanently, at the discretion of the court."'" (*Navarro v. Cervera* (2025) 108 Cal.App.5th 229, 237.) Any renewal "shall be subject to termination, modification, or subsequent renewal by further order of the court either on written stipulation filed with the court or on the motion of a party." (§ 6345(a).)

The standard for renewal is "whether the protected party entertains a reasonable apprehension of future abuse," meaning that "'the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension genuine and reasonable.'" (*Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 179; *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290 (*Ritchie*).) The court "should consider the evidence and findings on which that initial order was based in appraising the risk of future abuse should the existing order expire." (*Ritchie*, at p. 1290.) But the mere existence of the restraining order will seldom provide "*conclusive* evidence the requesting party entertains a 'reasonable apprehension' of future abuse of any kind should that order expire." (*Id.* at p. 1291.) The court should also consider whether there have been "any significant changes in the circumstances surrounding the events justifying the initial protective order," such as whether "the restrained and protected parties moved

10

on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order." (*Ibid.*) But it is not necessary to introduce evidence of "actual acts of abuse the restrained party committed after the original order went into effect." (*Id.* at p. 1284; *G.G. v. G.S.* (2024) 102 Cal.App.5th 413, 422.)

We review for abuse of discretion the trial court's denial of a request to renew a domestic violence restraining order. (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 601.) We independently review whether the trial court applied the correct legal standard in exercising its discretion. (*Michael M. v. Robin J.*, *supra*, 92 Cal.App.5th at p. 179.)

III.     *Alleged errors*

The argument section of Stewart's opening brief is separated into three sections, each of which contains numerous claims of error. Many of the arguments are not supported by citations to the record or to legal authority or do not contain any legal analysis. We deem all such arguments forfeited. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 279.)

A.     *Claimed evidentiary and related errors*

Stewart presents six arguments concerning evidentiary and related procedural issues.

First, Stewart argues that the trial court erred by not granting his request to continue the hearing so that he could secure the testimony of certain law enforcement officers. The argument fails because Stewart did not make any such request. Although

11

he expressly considered asking for a continuance on that basis, Stewart then said, "I don't think that's needed for you to renew the order here today," and "I believe that I've proven in enough sufficient evidence, you know." Thus, instead of asking for a continuance, Stewart told the trial court that he did not need one because he believed that he had presented sufficient evidence to support the renewal without the officers' testimony. The trial court did not err by failing to grant a continuance request that Stewart never made. (See *People v. Partida* (2005) 37 Cal.4th 428, 435.)

Second, Stewart argues that the trial court erred by admitting the audio recording evidence, because the recordings were "unsworn" and "unauthenticated." He also argues that the admission of the recordings violated his right to due process and his Sixth Amendment right to confront and cross-examine witnesses as interpreted by *Crawford v. Washington* (2004) 541 U.S. 36, 68-69.[3] Stewart did not object on those grounds in the trial court. Evidentiary objections not made in the trial court generally will not be considered on appeal. (Evid. Code, § 353, subd. (a); *People v. Williams* (1997) 16 Cal.4th 635, 661-662 [authentication objection to tape recording forfeited]; *People v. Redd* (2010) 48 Cal.4th 691, 729-730 [constitutional claim of right to confrontation forfeited].) Stewart objected on the grounds that Morris did not produce the recordings

---

[3]     "The confrontation clauses in the federal and state Constitutions are limited to criminal prosecutions and do not apply in civil proceedings." (*People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1568, fn. 8.) In a civil proceeding, such as for a domestic violence restraining order (see, e.g., Evid. Code, § 756, subd. (b)(1)), "the right to confront and cross-examine witnesses derives from the due process clauses of the state and federal constitutions" (*San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 574).

12

before the hearing and that the recording of Susan was protected by marital privilege. Those objections were not sufficient to preserve the arguments he now raises. (*Redd*, at pp. 729-730.) Moreover, Stewart does not argue that he should be excused from forfeiture because further objection would have been futile. (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.) And we will not develop an appellant's argument for them. (*Pacific Bell Telephone Co. v. County of Placer* (2025) 111 Cal.App.5th 634, 640.) We accordingly deem forfeited the arguments challenging the admission of the recordings.

Third, Stewart argues that the trial court's "rejection of the marital or spousal privilege argument by appellant may have been error where appellant[']s wife not being at the trial could have been taken as an assertion of her right not to testify against her husband." The trial court correctly concluded that the recording of Susan speaking to Morris was not protected by marital privilege. The privilege applies only to communications between spouses. (Evid. Code, § 980.)

Fourth, Stewart argues that the trial court erred by not admitting Susan's newly notarized affidavit. Stewart did not make an offer of proof describing the substance of the new affidavit. We generally cannot "consider a claim that the trial court erroneously excluded evidence unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (*People v. Hardy* (2018) 5 Cal.5th 56, 103, quoting Evid. Code, § 354, subd. (a).) Moreover, assuming for the sake of argument that the trial court erred by excluding the new affidavit, Stewart does not argue that it is reasonably probable that

13

absent the claimed error, the outcome would have been more favorable to him. (*Hatley*, *supra*, 94 Cal.App.5th at p. 592.) Reversal is not warranted by error alone. (*Falcone*, *supra*, 164 Cal.App.4th at p. 822.) We will not "act as counsel for appellant by furnishing a legal argument as to how the trial court's ruling was prejudicial." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 (*Century Surety*).) Because Stewart has failed to argue that the error was prejudicial, he has failed to carry his burden of establishing reversible error. (*Ibid.*)

Fifth, Stewart argues that he was prejudiced by Morris's purportedly false testimony that Stewart was attempting to control members of the household rather than protect them, which the trial court likely believed. As the trier of fact, the trial court was "the exclusive judge of the credit and weight to be given to the testimony of a witness" and was thus free to believe Morris. (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.) "'"We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence."'" (*Ibid.*)

Sixth, Stewart argues that the trial court violated his right to a fair trial by ordering "important testimony elicited from a recording played by [Morris] not to be transcribed." Stewart did not object when the trial court directed the reporter not to transcribe the recordings, so the argument is forfeited. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Had Stewart objected in the trial court, the court could have resolved the issue by ordering the reporter to transcribe the recording. (*Ibid.*) Moreover, because the claimed error does

not present "an important legal issue," we decline to consider the argument despite the forfeiture.  (*Ibid.*)

B.    *Other alleged errors*

Stewart also challenges the trial court's application of the law.  We find no prejudicial error.

Stewart contends that the trial court applied the wrong legal standard by focusing on acts of violence alone, which he argues is demonstrated by the court's reliance on the fact that Morris now lives in Texas.  We disagree.  The trial court properly considered the changed circumstance of Morris's relocation to Texas in evaluating whether to renew the order.  (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1291.)  Moreover, in denying renewal, the court reasoned that the relocation rendered future "communications" from Morris to Stewart unlikely.  Contrary to Stewart's characterization of the court's ruling, the focus on possible future "communications" shows that the court considered the relocation's impact on forms of abuse other than physical violence.

Stewart also argues that the trial court applied the wrong legal standard by requiring Stewart to introduce evidence of abuse that occurred after issuance of the original order and by "entangl[ing] and bait[ing Stewart] into spending considerable time explaining all the incidents of abuse that had taken place over the 3 year order."  The trial court never stated that new acts of abuse were necessary to support renewal, and the record does not reveal any other indication that the trial court believed that was the applicable standard.  Absent a contrary indication, we presume that the trial court

15

followed the applicable law and thus understood that the restraining order could be renewed without any showing of abuse since its issuance. (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 500; § 6345(a).)

Moreover, the trial court did not limit Stewart's testimony. Rather, the trial court told Stewart to tell the court why he believed that the restraining order should be renewed. Stewart was thus free to testify about whatever he deemed relevant to renewal. Without prompting, he testified that he believed that renewal was mainly supported by new acts of abuse. To the extent that the court questioned Stewart about those alleged acts of abuse, such evidence was relevant to determining the propriety of renewal, even though evidence of further abuse was not required. (*Ritchie*, *supra*, 115 Cal.App.4th at pp. 1290-1291.)

Stewart next argues that the trial court committed legal error by not considering adding other household members to his restraining order. Section 6345(a) authorizes a trial court to renew a domestic violence restraining order and to modify a renewed order upon written stipulation of the parties or on a party's motion. But Stewart has not provided any legal authority for the proposition that section 6345(a) permits a trial court to modify a restraining order to add other adults as protected persons in the absence of a request by those adults themselves. Nor are we aware of any such authority. *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389 (*Perez*) is inapposite, because it involved a modification request to add the protected person's minor children to the order. (*Id.* at pp. 392, 400-401.)

16

Finally, relying on *Perez*, Stewart argues that the trial court abused its discretion by concluding that conduct directed toward others was not relevant to analyzing whether Stewart had a reasonable apprehension of future abuse to support renewal. We agree that the court's conclusion was legally incorrect, but we find no prejudice. *Perez* held that evidence of abuse toward the couple's minor children was relevant to the renewal determination. (*Perez*, *supra*, 1 Cal.App.5th at p. 400.) *Perez* reasoned that the evidence was relevant because the DVPA defined abuse as including reasonable fear of injury to another and disturbing the other party's peace. (*Perez*, at pp. 400-401.) Because the abuse of the children "destroyed [the mother's] emotional calm and made her fear for her safety and the safety of the children," *Perez* concluded that the trial court erred by not considering the evidence in ruling on the mother's request for renewal of the restraining order. (*Id.* at p. 401.)

The trial court in the present case likewise erred by concluding that evidence of Morris's conduct directed toward others was not relevant to ascertaining whether Stewart possessed a reasonable apprehension of future abuse to support renewal. However, the trial court's error does not warrant reversal unless it was prejudicial, that is, unless there is a reasonable probability that Stewart would have obtained a more favorable result absent the error. (*Hatley*, *supra*, 94 Cal.App.5th at p. 592; *Priscilla N. v. Leonardo G.* (2017) 17 Cal.App.5th 1208, 1215.) Stewart does not argue that the trial court's error was prejudicial, so he has failed to carry his burden of establishing reversible error. (*Century Surety*, *supra*, 139 Cal.App.4th at p. 963.)

## DISPOSITION

We affirm the order denying Stewart's request to renew the domestic violence restraining order.  Morris shall recover his costs of appeal, if any.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ      

J.

We concur:

RAMIREZ      

      P. J.

MILLER      

      J.